IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| NEWPATH NETWORKS, LLC, A NEW JERSEY LIMITED LIABILITY COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | 2:10-cv-00236-GEB-KJM |
| v. | ) ) | ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION |
| THE CITY OF DAVIS, CALIFORNIA, A GENERAL LAW MUNICIPALITY, | ) ) ) | |
| Defendant. | ) ) ) | |

This case concerns whether NewPath Networks, LLC ("NewPath") must first comply with the city of Davis' (the "City") Wireless Telecommunications Facilities Ordinance ("WTF Ordinance") before constructing a proposed distributed antenna system ("DAS") within the City. NewPath now seeks a preliminary injunction that would require the City to reinstate thirty-six revoked encroachment and building permits which authorize NewPath to construct its DAS, declare the City's "Stop Work Notice" "null and void" and enjoin the City, "its officers, agents, servants, employees and attorneys . . . from acting in any manner contrary [to the Court's order]." (Proposed Order 3:17-22.) NewPath argues this preliminary injunction should issue since "[t]he City's actions are contrary to[,] and preempted by state and federal law and immediate and irreparable injury will result to NewPath unless the [City's] activities . . . are enjoined pending

trial of this action." (Not. of Mot. for Prelim. Inj. 2:16-18.) The City opposes NewPath's motion. Oral argument on NewPath's motion was held on March 8, 2010. For the reasons stated below, NewPath's motion for a preliminary injunction is DENIED.

## I. LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that he is (1) "likely to succeed on the merits"; (2) "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "a preliminary injunction is in the public interest." Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing Winter v. Natural Res. Def. Council, Inc., --- U.S. ----, ----, 129 S. Ct. 365, 374, 172 L.Ed 2.d 249 (2008)); see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009) (adopting the preliminary injunction standard articulated in Winter). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 129 S. Ct. at 376. "If a plaintiff fails to meet its burden on any of the four requirements for injunctive relief, its request must be denied." Sierra Forest Legacy v. Rey, --- F. Supp. 2d ----, 2010 WL 715846, at *1 (E.D. Cal. 2010) (citing Winter, 129 S. Ct. at 376). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Indep. Living Ctr. of S. Cal. Inc. v. Maxwell-Jolly, 572 F.3d 644, 651 (9th Cir. 2009) (quoting Winter 129 S. Ct. at 376).

The purpose of a preliminary injunction is to preserve the relative positions of the parties - the status quo - until a trial on

the merits can be conducted.  <u>LGS Architects, Inc. v. Concordia Homes of Nev.</u>, 434 F.3d 1150, 1158 (9th Cir. 2006) (quoting <u>Univ. of Tex. v. Camenisch</u>, 451 U.S. 390, 395 (1981)).  "Injunctions are classified as 'prohibitory' or 'mandatory,' depending on their effect on the party enjoined.  A prohibitory injunction preserves the status quo, while a mandatory injunction goes beyond simply maintaining [the] status quo and compels the performance of an affirmative act."  <u>Bailey v. Clovis Unified Sch. Dist.</u>, No. 08-CV-0146-AWI-GSA, 2008 WL 410613, at *3 (E.D. Cal. Feb. 12, 2008) (citing <u>Stanley v. Univ. of S. Cal.</u>, 13 F.3d 1313, 1320 (9th Cir. 1994)).  "A party enjoined by a mandatory injunction must undo the wrong or injury with which he or she is charged."  <u>Id.</u>  Therefore, "[a] mandatory injunction goes well beyond simply maintaining the status quo <u>pendente</u> <u>lite</u> and is particularly disfavored.  When a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party."  <u>Stanley</u>, 1313 F.3d at 1320 (quotations and citations omitted).

The City argues NewPath seeks a "mandatory" injunction and that the facts and law do not clearly favor granting NewPath the relief it seeks.  NewPath rejoins, arguing it is requesting an order prohibiting the City from interfering with the construction of its DAS.  However, NewPath's proposed preliminary injunction order seeks to have the Court compel the City to reinstate the encroachment and building permits the City has revoked.  The effect of such an order would require the City to take affirmative action.  <u>Cf.</u> <u>Bailey</u>, 2008 WL 410613, at *3 (characterizing an injunction that would have compelled a school district to remove a ban and reinstate a student on a school's basketball team, as a request for mandatory relief).

Further, granting NewPath's request for injunctive relief would allow
NewPath to construct its DAS prior to the resolution of its claims at
trial, altering the current status quo.  Therefore, NewPath seeks
mandatory relief which is governed by the heightened standard
articulated in Stanley.

The City's opposition to NewPath's motion includes a request
that judicial notice be taken of four documents: 1) an "Order Denying
Plaintiff's Motion for Summary Judgment" filed on December 23, 2009,
in NewPath Networks, LLC, v. City of Irvine, Case No. SACV 06-550-JVS
(Anx), in the United States District Court for the Central District of
California; 2) City of Davis Resolution No. 10-010, Series 2010,
Resolution Adopting Findings and Determinations re: NewPath Networks,
LLC's Appeal of Permit Rescission; 3) Exhibit 5 to NewPath's
supplemental appeal letter to the City Council, dated January 14,
2009; and 4) the Petition to the City of Davis City Council to
Disallow the Cell Tower Installation in Village Homes submitted to the
City Clerk for the January 19, 2010 City Council meeting.  (Request
for Judicial Notice ("RJN") Exs. 1-4.)  NewPath does not oppose the
City's request for judicial notice of these documents.

Under Federal Rule of Evidence 201, a district court may
take judicial notice of a fact "not subject to reasonable dispute"
because "it is either (1) generally known within the territorial
jurisdiction of the trial court or (2) capable of accurate and ready
determination by resort to sources whose accuracy cannot reasonably be
questioned."  Fed. R. Evid. 201(b).  A court "may take judicial notice
of a record of a state agency not subject to reasonable dispute."
City of Sausalito v. O'Neil, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004)
(citations omitted); see also Mack v. S. Bay Beer Distribs., Inc., 789

F.2d 1279, 1282 (9th Cir. 1986) (stating that a court may take judicial notice of "matters of public record"), <u>overruled on other grounds by</u>, <u>Astoria Fed. Sav. & Loan Ass'n v. Solimino</u>, 501 U.S. 104, 111 (1991). Further, a district court may take judicial notice of "a doctrine or rule of law" from an unpublished district court opinion. <u>M/V Am. Queen v. San Diego Marine. Constr. Corp.</u>, 708 F.2d 1483, 1491 (9th Cir. 1983) (finding judicial notice of unpublished district court order proper).

The City of Davis Resolution No. 10-010, NewPath's supplemental appeal letter to the City Council and the Petition to the City Council are matters of "public record" and are appropriate for judicial notice. Further, judicial notice may be taken of the existence of litigation in <u>NewPath Networks, LLC v. City of Irvine</u>, as well as the "doctrine[s] or rule[s] of law" discussed therein. <u>See</u> <u>M/V Am. Queen</u>, 708 F.2d at 1491; <u>see also</u> <u>BP West Coast Prods. LLC v. Greene</u>, 318 F. Supp. 2d 987, 994 (E.D. Cal. 2004) (taking judicial notice of "opinions, complaints, briefs and evidence filed in other actions . . . not for the truth of the facts asserted" but rather to "show that various contentions and arguments have been raised in other actions and review how other courts have addressed [those] issues"). Therefore, the City's request for judicial notice of these four documents is granted.

## II. BACKGROUND

NewPath is a competitive local exchange carrier, authorized by the California Public Utilities Commission ("CPUC"), under a Certificate of Public Convenience and Necessity ("CPCN"), to provide "full facilities-based competitive local exchange and access services . . . for the entire state of California." <u>In re Application of</u>

<u>NewPath Networks, LLC (U-6928-C) for a Modification to its Certificate</u>
<u>of Public Convenience and Necessity</u>, 2006 Cal. PUC LEXIS 118 (Apr. 13, 2006).  NewPath provides wireless carriers ("Customer Carriers") with access to its distributed antenna systems ("DAS").  (Kavanagh Decl. ¶¶ 3-4.)  A DAS is a network typically comprised of "small, low-power antennas," referred to as "nodes," connected to a "central hub" by "fiber optic cable."  (<u>Id.</u> ¶¶ 13-15.)  Each node is located on or in light standards, traffic signals or other vertical structures.  (<u>Id.</u> ¶ 15.)  NewPath's DAS receives and transmits the wireless telephone and data communication signals of its Customer Carriers.  (<u>Id.</u> ¶¶ 5-6.)  NewPath describes its DAS as a "dumb pipe," which its Customer Carriers can use to provide wireless communications to their subscribers; Newpath thus characterizes itself as a "carrier's carrier."  (<u>Id.</u> ¶¶ 1, 16.)

Between January 2009 and October 2009, NewPath engaged in discussions with City officials concerning NewPath's proposal to build a DAS within the City, which included discussions with the City's Chief Information Officer, Principal Planner, Assistant Director of Public Works, Electrician and Engineer.  (Sears Decl. ¶¶ 4-14.)  NewPath's proposed DAS calls for the installation of twenty-four wireless antenna facilities ("nodes") within the City.  (Marshall Decl. ¶ 4.)  NewPath would construct seventeen wooden or metal poles, approximately forty-two feet high, to host nodes, while the other nodes would be placed on existing telephone or electric poles.  (<u>Id.</u>)  Each node would be connected to the other nodes and a central hub by fiber optic cable.  (Kavanagh Decl. ¶ 10.)  NewPath explained to City officials that "under the CPUC's rules . . . [NewPath only] need[ed] [to] obtain . . . encroachment permits from the City" and did not need

to comply with the City's WTF Ordinance.  (Sears Decl. ¶¶ 5, 16, 17; Garcia Decl. ¶ 3.)  NewPath also spoke with City officials about the best location and configuration for each node, in order to minimize the impact on local residents.  (Sears Decl. ¶ 17.)

Following these discussions, the City issued NewPath thirty-six encroachment and related building permits between September 2, 2009 and November 13, 2009, for the construction of the proposed DAS. (Marshall Decl. ¶ 2.)  NewPath obtained a "Notice to Proceed" ("NTP"), from the Energy Division of the CPUC on November 25, 2009, which granted NewPath "authority to proceed with the construction" of the Davis DAS project.  (Mot. for Prelim. Inj. Ex. 7.)  The NTP states: "[t]he Energy Division has reviewed NewPath's proposal to construct the Davis DAS project in the City of Davis, California and has determined that the proposed construction activities are consistent with the activities found by the Commission to be categorically exempt from the requirements of [the California Environmental Qualify Act ('CEQA')]."  (Id.)

The City Manager issued a "Stop Work Notice," on November 30, 2009, ordering NewPath to "cease and desist all work" authorized by the thirty-six permits, "to allow for investigation of potential conflicts with the City's [WTF Ordinance] and to determine whether [the] permits were issued properly."  (Mot. for Prelim. Inj. Ex. 3.) Shortly thereafter, the City Manager rescinded all thirty-six of NewPath's permits in a letter dated December 5, 2009 (the "Rescission Letter"), stating the permits were improperly issued because:

> (1) NewPath did not, and has not, complied with the City's [WTF] Ordinance; (2) Certain of the permits for ground based fiber and conduit rely on the location of the wireless facilities, which . . . have not been approved and which may not meet the local requirements

for wireless facilities in the City's ordinances; (3) other permits rely on access to public property that is not within the public rights of way for which no agreements have been reached to permit access and use by NewPath, and (4) certain poles and other above ground facilities (including proposed monopoles) are proposed for locations that do not permit above ground facilities. Further, there has been no showing that the proposed locations of the wireless facilities are each necessary given the impacts of these facilities on the public, including both public safety and aesthetic impacts.

(Mot. for Prelim. Inj. Ex. 5.) The Rescission Letter also states that "NewPath [may] file an appeal of [the permit revocations] to the City Council within 10 calendar days," or alternatively, may "apply for permits" in compliance with the City's WTF Ordinance. (Id.)

NewPath filed a timely appeal of the City Manager's permit revocation with the City Council, raising the following four arguments:

1. NewPath has worked with the City for eleven months on all aspects of the project ensuring that the design of NewPath's distributed antenna system ("DAS") was acceptable to the City and that NewPath has complied with all City requirements for obtaining the permits.

2. NewPath relied in good faith on the permits and, to date, has expended over $1 million in material and construction costs and incurred contractual obligations in that good faith reliance.

3. NewPath has obtained a vested property right to proceed with the proposed DAS project.

4. The City's Telecommunications Ordinance . . . does not apply to NewPath . . . and, even if it did, its 500-foot setback provisions for residential and mixed use areas constitutes both actual and effective prohibition of telecommunications services under federal law.

(Mot. for Prelim. Inj. Ex. 10.) In support of its appeal, NewPath submitted to the City Council numerous reports, surveys and other documentation, allegedly demonstrating the existence of significant

gaps in coverage and the alternative locations for its nodes that
NewPath had considered prior to the City's issuance of the Stop Work
Notice.  (Hall Decl. Exs. 1-5.)

The City Council held a public meeting on NewPath's appeal
on January 19, 2010, following which the City Council issued and
adopted Resolution No. 10-010, Series 2010, which denies NewPath's
appeal of the City Manager's decision to rescind NewPath's
encroachment and building permits.  (Mot. for Prelim. Inj. Ex. 6.)
The Resolution includes the following pertinent findings of fact in
support of the City Council's decision:

> 11.  The City has a Wireless Telecommunications
> Facilities Ordinance, DMC 40.29.0 ("Wireless
> Ordinance") that was, and continues to be, in
> effect at the time NewPath submitted its
> application . . . .
>
> 13.  The permits issued to NewPath violated the City's
> Wireless Ordinance . . . .  The Wireless Ordinance
> prohibits telecommunication projects in
> residential, school, and public park and/or
> greenbelt zones.  The Wireless Ordinance also
> requires an additional 500 foot setback requirement
> from residential and school zones, with specified
> exceptions.
>
> a.  All of the proposed antennas are located in or
> within 500 feet of residential, park,
> greenbelt, or corresponding planned
> development zones.
>
> b.  In addition, Permit #09-777700192 . . . is
> located on City-owned property outside the
> right of way and public utility easements.
> But NewPath does not have an approved lease to
> utilize that site . . . .
>
> c.  One site . . . is located in Planned
> Development for Neighborhood Commercial uses,
> but within 500 feet of a residential zone.
> However, the Wireless Ordinance has an
> exception from the 500 foot setback
> requirement, but any telecommunication
> facility at this site would be required to go
> through the [conditional use permit] process,
> including notice to the public and a public

hearing, and be fully stealthed . . . .   This
                              exemption process was not followed.

               14.    Neither NewPath's CPCN nor NTP fall within the
                      exemption in DMC § 40.29.060(j) or the Wireless
                      Ordinance; nor do they preempt application of the
                      Wireless Ordinance to NewPath's proposed DAS
                      project.  Neither the CPCN nor the NTP contain any
                      express preemption of local authority. The NewPath
                      CPCN is not site-specific; rather, it applies
                      state-wide.  The NTP is site-specific; however, by
                      its terms, it is limited to the issue of whether
                      the DAS project comes under a CEQA categorical
                      exemption and does not address the applicability of
                      local regulations.  The City's Wireless Ordinance
                      does not conflict with the CPCN or NTP, but is
                      instead a local time, place and manner regulation
                      expressly authorized by the Public Utilities Code.
                      Pub. Util. Code § 7901.1 . . . .  Accordingly, the
                      City Manager did not err in rescinding NewPath's
                      permits for the DAS project . . . .

               17.    Rescission of the improperly issued encroachment
                      and related building permits at issue does not mean
                      NewPath is effectively prohibited from utilizing
                      its CPCN to access the public rights of way.
                      Rescission of the permits simply means NewPath must
                      apply for permits pursuant to the City's Wireless
                      Ordinance.   If NewPath shows that particular
                      proposed sites prohibited under the Wireless
                      Ordinance are necessary to eliminate significant
                      gaps in coverage, *i.e.*, there are no reasonable
                      alternative locations permissible under the
                      Wireless Ordinance, then NewPath may seek an
                      exemption from the Wireless Ordinance that is
                      consistent with the City's aesthetic and safety
                      concerns, including consideration of collocation on
                      existing poles or light stanchions.

(Mot. for Prelim. Inj. Ex. 6.)  After the hearing, the City sent

NewPath a letter dated January 21, 2010, enclosing a certified copy of

the Davis City Council Resolution, and stating "[t]h[e] Resolution

reflects the final action taken January 19, 2010."  (Id.)

               On January 28, 2010, NewPath filed a complaint in this

federal court, alleging that the City's revocation of the thirty-six

encroachment and building permits violates both state and federal law.

                                        10

Shortly thereafter, NewPath filed its preliminary injunction motion *sub judice*.

//

### III.   DISCUSSION

#### A.   Likelihood of Success on the Merits

#### 1.   Preemption of The City's WTF Ordinance by State Law

NewPath argues that the City's application of the WTF Ordinance to NewPath exceeds the City's authority under the California Constitution and the California Public Utilities Code.  Specifically, NewPath argues, "[u]nder the California Constitution, state law, and related rulings of the CPUC, the City does not retain the authority to require that NewPath submit to the discretionary permitting process outlined in the WTF Ordinance as a precondition of construction of telecommunication facilities or, in the alternative, require that NewPath submit to an unspecified exemption process that is neither codified nor contemplated in the City's WTF Ordinance."  (Mot. for Prelim. Inj. 2:10-14) (emphasis omitted).

"The California Constitution authorizes local governments to make and enforce within their limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates, 583 F.3d 716, 722 (9th Cir. 2009) (quoting Cal. Const. art. XI, § 7).  These "police powers" of local government, however, are limited by article XII of the California Constitution which vests the California legislature with "broad authority to regulate public utilities." Cal. Apartment Ass'n v. City of Stockton, 80 Cal. App. 4th 699, 708 (2000). Section 8 of Article XII provides that "[a] city, county, or other public body may not regulate matters over which the Legislature grants

regulatory power to the [California Public Utilities] Commission."
Cal. Const. art. XII, § 8. Section 5 of Article XII vests the
legislature with "plenary power, unlimited by other provisions of [the
California] constitution . . . to confer additional authority and
jurisdiction upon the [Public Utilities Commission]." Cal. Const.
art. XII, § 5. "Article XII, section 5 and 8 expressly authorize the
Legislature to confer authority upon the [CPUC] which is unlimited by
other provisions of the constitution and which is superior to the
charter powers of a city or county over municipal affairs . . . ."
Cal. Apartment Ass'n, 80 Cal. App. 4th at 709. However, sections 5
and 8 merely give the California legislature the authority to preempt
a municipality's police powers over a public utility. See People v.
City & County of San Francisco, 92 Cal. App. 3d 913, 925 (1979)
(stating that "absent an assertion by the state of its authority to
regulate . . ., the city has the power to do so"). Therefore,
application of the City's WTF Ordinance to NewPath is only invalid and
preempted if it conflicts with a specific grant of authority given to
the CPUC by the Legislature.

The applicable principles of preemption are well-settled
under California law:

> If otherwise valid local legislation conflicts with
> state law, it is preempted by such law and is void.
> A conflict exists if the local legislation
> duplicates, contradicts, or enters an area fully
> occupied by general law, either expressly or by
> legislative implication. Local legislation is
> 'duplicative' of general law when it is coextensive
> therewith. Similarly, local legislation is
> 'contradictory' to general law when it is inimical
> thereto. Finally, local legislation enters an area
> that is 'fully occupied' by general law when the
> Legislature has expressly manifested its intent to
> 'fully occupy' the area . . . or when it has
> impliedly done so in light of one of the following
> indica of intent: (1) the subject matter has been so

12

> fully and completely covered by general law as to
> clearly indicate that it has become exclusively a
> matter of state concern; (2) the subject matter has
> been partially covered by general law couched in
> such terms as to indicate clearly that a paramount
> state concern will not tolerate further or
> additional local action; or (3) the subject matter
> has been partially covered by general law, and the
> subject is of such a nature that the adverse effect
> of a local ordinance on the transient citizens of
> the state outweighs the possible benefit to the
> locality.

Sherwin-Williams Co. v. City of Los Angeles, 4 Cal. 4th 893, 897-98 (1993).

The City's WTF Ordinance seeks to "provide uniform standards for the community desired design, placement, permitting, and monitoring of telecommunication facilities consistent with applicable federal requirements." Davis, California Municipal Code ("DMC") § 40.29.010(a). "The standards are intended to address adverse visual impacts and operational effects of [telecommunications] facilities through appropriate design, siting, screening techniques and locational standards while providing for the communication needs of residents, local businesses and government agencies." Id. A "telecommunications facility" is defined in the WTF Ordinance as "[a] stand-alone facility . . . that transmits and/or receives electromagnetic or electro-optic signals . . . ." DMC § 40.29.030(j).

The WTF Ordinance classifies telecommunications facilities into three categories "based upon their level of impact": 1) "prohibited projects," 2) "exempt facilities," and 3) "facilities allowed if authorized pursuant to conditional use permit procedures." DMC §§ 40.29.050, 40.29.060, 40.29.070.

Specified telecommunications facilities are "exempt" from "discretionary review" under the WTF Ordinance, so long as they

satisfy certain "location and design requirements."  For example, a wireless communication facility is exempt "if and only to the extent that a permit issued by the California Public Utilities Commission (CPUC) or the rules and regulations of the Federal Communications Commission (FCC) specifically provide that the antenna is exempt from local regulation."  DMC § 40.29.060(j).

Other "telecommunications projects" are "prohibited," including telecommunications projects "within areas zoned or designated on the General Plan Land Use map for residential uses . . . or within 500 feet of said areas so designated or zoned" or "on existing or planned public parks and/or greenbelts."  DMC § 40.29.050.

Proposed "telecommunication facilities" that are neither "prohibited" nor "exempt," are to be "reviewed in accordance with Article 40.30 [and the requirements therein for a conditional use permit],. . . provided the facilities meet [certain] location and design standards . . . ."  DMC § 40.29.070; § 40.29.040(b).  "[A]ll applications for telecommunication projects that require a Conditional Use Permit . . . shall be submitted to the Community Development Department . . . ."  DMC § 40.29.080(a).

NewPath argues state laws preempt and preclude the application of the WTF Ordinance to NewPath's DAS project in the City. First, NewPath contends that California Public Utilities Code section 1001 ("section 1001"), combined with Newpath's CPCN, preempts application of the WTF Ordinance.  Second, NewPath argues that California Public Utilities Code sections 7901 and 7901.1 ("section 7901" and "section 7901.1," respectively) also preempt application of the WTF Ordinance.

### a. Preemption of the WTF Ordinance Under California Public Utilities Code Section 1001

Section 1001 provides that "[n]o . . . telephone corporation . . . shall begin the construction of . . . a line, plant or system, or of any extension thereof, without first having obtained from the [CPUC] a certificate that the present or future public convenience and necessity require or will require such construction."  Cal. Pub. Util. Code § 1001.

NewPath argues that the California legislature has "established a regulatory scheme involving issuance of CPCNs under which the CPUC is specifically vested with authority over construction of public utility facilities . . . ."  (Mem. for Prelim. Inj. 13:12-14.)  NewPath further asserts that the City's WTF Ordinance "duplicates . . . and contradicts" authority vested with the CPUC and "[a]llowing local authorities to block construction projects as to which the CPUC has made a determination of necessity . . . would . . . conflict with the general law of the state."  (Id. 13:27-14:1, 13:17-20.)  The City rejoins that neither the legislature nor the CPUC have preempted local regulation in this context.  The City relies in part on <u>NewPath Networks, LLC v. City of Irvine</u>, No. SACV 06-550-JVS (Anx) (C.D. Cal. Dec. 23, 2009) (unpublished slip copy), as support for its argument that NewPath's CPCN does not preempt application of local zoning regulations.  NewPath relies on the same CPCN in this action, whose preemptive effect was analyzed by the court in <u>City of Irvine</u>.

In <u>City of Irvine</u>, NewPath filed suit challenging the city of Irvine's refusal to issue NewPath a conditional use permit under its wireless communications ordinance.  <u>Id.</u> at *1.  NewPath moved for summary judgment, arguing in pertinent part, that Irvine's wireless

communications ordinance, as applied to NewPath, was preempted under the California Constitution. Id. at *1. NewPath argued that the "CPUC's grant of a CPCN and a NTP to NewPath gave it a right to construct the DAS facility free from any limitations imposed by Irvine." Id. at *6. The district court in City of Irvine rejected NewPath's preemption argument, reasoning as follows, which is persuasive and adopted:

On the face of Section 1001, there appears to be no conflict with local permitting authority. The statute merely requires a utility to get permission from the CPUC before proceeding with any construction. It does not preclude a utility from having to get permission from a local government. At best, the statute is ambiguous as to whether a CPCN is merely the first hurdle for a utility, as opposed to the only hurdle. It is not necessarily duplicative of local permitting-the CPUC and local governments often have different criteria for approval, as the CPUC recognizes. GO 159A, 1996 Cal. PUC LEXIS 288, at *39-40. Neither is local permitting authority contradictory-that a utility might have to obtain approval from two separate agencies is not inherently contradictory. And lastly, no express preemption nor implicit intent to preempt is evident on the face of Section 1001. The statute does not necessarily occupy the entire field of utility regulation and local interests will often weigh substantially in construction decisions.

The few cases touching on the issue suggest that the CPCN is not the final hurdle, contrary to NewPath's argument. The California Court of Appeal laid out the statutory framework as follows:

A telephone company must obtain a certificate of public convenience and necessity from the California Public Utilities Commission in order to construct new facilities. (§ 1001.) It may use the public highways to install its facilities. (§ 7901.) The local government may "exercise reasonable control as to the time, place, and manner in which roads, highways, and waterways are accessed." (§ 7901.1, subd. (a).)

Williams Commc'ns., LLC v. City of Riverside, 114 Cal. App. 4th 642, 648 (Ct. App. 2003). Williams makes clear that, even after a telephone company has received a CPCN, it is subject to the authority of local governments to control the time, place and manner of

16

facilities. See also Pac. Tel., 197 Cal. App. 2d at 150-51 (holding that telephone companies have a statutory right to use rights of way under Section 7901, but must get CPCN).

The authorities which NewPath cites are not to the contrary. In San Diego Gas & Elec. Co. v. City of Carlsbad, 64 Cal. App. 4th 785 (Ct. App. 1998), which dealt with the regulation of power companies, the CPUC had exercised exclusive authority over the regulated entity. Id. at 796, 801-02. The CPUC has not exercised exclusive authority over telephone companies. See generally GO 1591, 1996 Cal. PUC LEXIS 288 . . . . NewPath has identified no similar provision affecting the litigation here.

However, decisions by the CPUC have indicated that the CPUC may preempt local authority with a CPCN when it chooses to do so. For example, in In re the Application of Frontier Local Servs. Inc., Dec. No. 96-09-072, 1996 Cal. PUC LEXIS 947 (Cal. P.U.C. Sept. 20, 1996), [upon which NewPath relies,] the CPUC granted a CPCN to a petitioner, subject to the condition that "[t]he local land use or planning agency shall be consulted by petitioner so that any site-specific aesthetic impacts are assessed and properly mitigated." Id. at *49. However, the CPUC specifically noted that this duty to consult did not give local governments free reign to regulate:

> "[L]ocal jurisdictions cannot impose standards or permit requirements which would prevent petitioners from developing their service territories, or otherwise interfere with the statewide interest in competitive telecommunication service. There, the petitioners' required compliance with local permit requirements is subject to this limitation."

Id. at *48-49. Indeed, in a response to a comment on the Negative Declaration, the CPUC asserted exclusive jurisdiction over the specific project at issue:

> "[T]he Commission's statutory authority (State Constitution and Public Utilities Code Section 1001) preempts local use or discretionary permits for utility projects, unless the Commission specifically delegates such authority to local governments (e.g. General Order 159A). The Certificate of Public Convenience and Necessity (CPCN) being sought by the [CLEC's] covered in this Negative Declaration is the Commission's 'use' permit for [CLEC] projects. The Commission specifically recognizes the importance of local input on specific environmental impacts that may arise, but the authority for a

17

discretionary permit by a local agency is preempted by the CPCN.

Id. at *83.

Similarly, in In re the Application of GTE Mobilnet of San Jose Ltd. P'ship, Dec. No. 86-09-011, 1986 Cal. PUC LEXIS 568 (Cal. P.U.C. Sept. 4, 1986), the CPUC considered the application for a specific site of a WCF. The CPUC noted that:

> after this Commission has determined, after opportunity for objection and public hearing, that the public convenience and necessity requires construction or extension of a public utility system, and the Commission has adopted a Negative Declaration which became final, which determinations fix locations and necessary facilities and structures but left to local discretion appropriate landscaping, exterior building treatment, and similar ancillary visual mitigation measures, the governing body of a local jurisdiction is precluded to go further and attempt to determine whether the service authorized is locally desired or would be beneficial to the jurisdiction, or whether the location or type fixtures are those preferred locally. . . . [T]his legal principal has particular applicability to a situation . . . where the facility involves erection of a pole to support an antenna . . . at a specific site determined to be especially suitable and necessary.

Id. at *18 (emphasis added). Thus, where the CPUC has had a hearing on a site-specific CPCN, then the CPCN is more likely to preempt local permitting authority.

Accordingly, the Court finds that CPCNs in the context of a telephone utility can be preemptive but are not necessarily so. Where the CPUC is explicit that the CPCN preempts local authority, as in the case of a site-specific CPCN, then the local government cannot contradict that action. However, where the CPCN is more general and does not expressly preempt local power, then local governments retain some authority under their inherent police power and Section 7901.1 to control the time, place and manner of facilities otherwise approved by the CPUC . . . .

The NewPath CPCN and subsequent NTP was issued to allow NewPath to provide "full competitive local exchange, access and non-dominant interexchange services for the entire state of California." NewPath CPCN, 2006 Cal. PUC LEXIS 118, at *1. NewPath was "authorized to construct equipment to be installed in existing buildings or structures." Id. at *14. Any other construction had to be approved by the CPUC Energy

Division pursuant to an expedited California Environmental Quality Act ("CEQA") review process. Id. Before NewPath could start construction, it had to be issued a separate NTP from the Energy Division. Id. at *15.

The NTP for the [Davis] DAS project was issued, without hearing, by the Energy Division. . . . The Energy Division simply determined that the proposed project was within a categorical exemption to CEQA, and then "[g]rant[ed] NewPath with the authority to proceed with the construction of the project as described in the [Davis DAS application]." . . . .

The Court also finds that the CPCN and NTP are not the sort of Section 1001 actions that would preempt local permitting authority. Neither contains any express preemption of local authority. The NewPath CPCN is not site-specific; rather, it applies state-wide. The NTP is site-specific; however, by its terms, it is limited to the issue of whether the DAS project comes under a CEQA categorical exemption . . . . [The City's WTF Ordinance] is not coextensive with nor inimical to the CPUC Energy Division's expedited CEQA review.

Moreover, both orders were issued without public hearing. The Court is hesitant to find preemptive effect in a CPUC order that was issued without public hearing, especially in light of the CPUC's repeated statements on the importance of local input on WCF siting. GO 159A, 1996 Cal. PUC LEXIS 288, at *39-41; In re Frontier, 1996 Cal. PUC LEXIS 947, at *47-49. Thus, the Court finds that the NewPath CPCN and NTP were not intended to preempt [the City's WTF Ordinance and] authority over the time, place and manner of NewPath's construction of the DAS project.

City of Irvine, at *16-33.

Accordingly, neither section 1001 nor NewPath's CPCN preempt application of the City's WTF Ordinance, and NewPath's NTP does not transform NewPath's general CPCN into a "site specific" CPCN. See id. at *20. Therefore, NewPath has not demonstrated that it is likely to succeed on the merits of this preemption claim.

### b. Preemption Under California Public Utilities Code Sections 7901 and 7901.1

NewPath also argues the City's WTF Ordinance is preempted by NewPath's statutory entitlement to access public rights of way for the construction of telephone facilities under section 7901. (Mot. for

Prelim. Inj. 23:22-26.)  NewPath further contends that the City's

revocation of its encroachment and building permits violates

California Public Utilities Code section 7901.1 ("section 7901.1")

because the City's actions are not reasonable.  (Id. 27:19-28:8.)  The

City rejoins that "[t]he issuance of a CPCN does not grant NewPath

blanket authority to construct wireless facilities wherever and

whenever it may choose [and] NewPath is still subject to Section

7901.1's grant of authority to municipalities to reasonably regulate

the time, place and manner on which the public rights-of-way are

accessed."  (Opp'n 14:20-24.)

         Section 7901 provides that "telephone corporations may

construct lines of telegraph or telephone lines along and upon any

public road or highway, . . . and may erect poles, posts, piers or

abutments for supporting the insulators, wires, and other necessary

fixtures of their lines, in such manner and at such points as not to

incommode the public use of the road or highway . . . ."  However,

section 7901's grant of authority to telephone corporations is limited

by the provision in section 7901.1, which states: "municipalities

shall have the right to exercise *reasonable control* as to the *time,*

*place and manner* in which roads, highways, and waterways are

accessed."  Cal. Pub. Util. Code § 7901.1(a) (emphasis added).  "That

provision was added to the [Public Utilities Code] in 1995 to bolster

. . . cities' abilities with regard to construction management and to

send a message to telephone corporations that cities have authority to

manage their construction, without jeopardizing the telephone

corporations' statewide franchise."  Palos Verdes Estates, 583 F.3d at

724 (quotations and citations omitted).  In Palos Verdes Estates, the

Ninth Circuit concluded that "[t]he California Constitution gives [a

20

city] the authority to regulate local aesthetics [of proposed wireless telecommunications facilities], and neither PUC § 7901 nor PUC § 7901.1 divests it of that authority." Id. at 721-22.

NewPath argues that Palos Verdes Estates is distinguishable since the plaintiff there was a "cellular service provider" without a CPCN, whereas NewPath is a competitive local exchange carrier with a CPCN which authorizes NewPath's proposed construction activities. (Reply 9:11-16.) However, since NewPath has not shown its CPCN preempts application of the City's WTF Ordinance, its attempt to distinguish Palos Verdes Estates on this ground is unavailing. Therefore, NewPath has not demonstrated that the City's WTF Ordinance is an impermissible "time, place and manner" regulation.

NewPath further argues that the City's revocation of its permits is "unreasonable," and constitutes an "effective prohibition" under section 7901.1. (Reply 12:19-22.) Specifically, NewPath argues "[t]he City's rescission of NewPath's permits on the grounds that NewPath must comply with the [City's WTF Ordinance] has the effect of prohibiting Newpath from providing its services in violation of both §§ 7901 and 7901.1." (Id. 12:19-21.) NewPath, however, has not shown that the City Council's decision upholding the City manager's revocation of NewPath's encroachment and building permits, was an exercise of the City's "time, place and manner" authority to which section 7901.1's "reasonableness" requirement applies. Therefore, NewPath has not demonstrated that it is likely to succeed on the merits of its preemption claims under sections 7901 and 7901.1.

## 2. Violations of The Telecommunications Act

NewPath makes three arguments under the federal Telecommunications Act of 1996 ("TCA"), Pub. L. No. 104-014, 110 Stat.

56 (codified as amended in various sections of U.S.C. titles 15, 18 and 47). Specifically, NewPath alleges the City's decision to revoke its permits constitutes an "effective prohibition" of the provision of personal wireless services under 47 U.S.C. § 332(c)(7)(B)(i)(II) and telecommunication services under 47 U.S.C. § 253(a) and also violates 47 U.S.C. § 332(c)(7)(B)(iii).

a. **NewPath's Claims Under Section 332(c)(7)(B)**

NewPath argues the City's permit revocation decision violates 47 U.S.C. § 332(c)(7)(B)(i)(II) since it effectively prohibits the provision of personal wireless services. Further, NewPath argues that the City's decision to affirm the revocation of its encroachment and building permits was not supported by "substantial evidence" and therefore violates section 322(c)(7)(B)(iii). The City rejoins that NewPath's claim of "effective prohibition" is not yet ripe for judicial review since NewPath has not applied for, and been denied, permits under the City's WTF Ordinance. NewPath counters that "[t]he City has made a final decision on the question of exemption" under the WTF Ordinance, and therefore its claims are ripe. (Reply 12:5-11.)

Section 332(c)(7) of the TCA provides in pertinent part:

(7) Preservation of local zoning authority

(A) General Authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government . . . over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

> > (I) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government . . .
>
> > > (II) shall not prohibit or have the effective of prohibiting the provision of personal wireless services . . . .
>
> > (iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record . . . .
>
> > (v) Any person adversely affected by any final action or failure to act by a State or local government . . . that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction . . . .

47 U.S.C. § 332(c)(7).

Congress has limited who may bring suit under section 332(c)(7)(B) to those persons "adversely affected by any *final action* or failure to act by a State or local government . . . ." 47 U.S.C. § 332(c)(7)(B)(v) (emphasis added). However, "[t]he TCA does not define 'final action,'" Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 46 (1st Cir. 2009), and the Ninth Circuit has not yet considered the statutory language. The interpretations provided by the First and Seventh Circuits, however, are persuasive and instructive.

In Omnipoint Holdings, the First Circuit assumed that in enacting the TCA, Congress was aware that "[t]he terms 'final' and 'final action' have special meaning in the law." Id. The Omnipoint Holdings court held that "[a] final action by a local government or

any instrumentality thereof must be one that marks the consummation of the instrumentality's decisionmaking process." Id. (holding that zoning board's decision denying special use permit was a final action within the meaning of section 332(c)(7)(B) of the TCA).

The Seventh Circuit, in Sprint Spectrum, L.P. v. City of Carmel, 361 F.3d 998 (7th. Cir. 2004), also addressed the definition of a "final action" under section 332(c)(7)(B)(v). In Sprint Spectrum, Sprint, a cellular telephone service provider, brought a claim under section 332(c)(7)(B) of the TCA, challenging a zoning board's decision upholding revocation of "an improvement location permit" Sprint had received to install a low-profile antenna. Id. at 1000-01. Sprint had entered into a lease with a resident of the city to place an antenna on a pre-existing radio tower. Id. at 1000. "Sprint applied to [the city's] Department of Community Services for an improvement location permit, which the city issued. The permit allowed Sprint to install special low-profile antennas on the sides of [an] existing tower . . . . [However], a neighboring property owner, took exception to the plan and appealed the issuance of the permit to the [city's] Board of Zoning Appeals (BZA). [The neighbor] alleged that the proposed Sprint antenna was not a permitted use for residential districts under the existing zoning ordinance and that a special use permit, or variance, was required before the plans for the tower could proceed." Id. The City then issued, a stop work order, and revoked Sprint's permit. Id. On Sprint's appeal, the BZA upheld the revocation of Sprint's improvement location permit, finding that "the use for which the improvement location permit was granted . . . is not a Permitted Use under the . . . Zoning Ordinance. As a result,

Sprint was required to seek a special use permit." Id. Instead of applying for a special use permit, Sprint brought suit under section 332(c)(7)(B) of the TCA, "arguing that the BZA's decisions were not supported by substantial evidence and unreasonably discriminated against Sprint." Id. at 1001.

The Seventh Circuit held that the "traditional analysis, enunciated in Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 105 S. Ct. 3108, 87 L. Ed. 2d 126 (1985), for determining when a complaint challenging a local land use decision is ripe for adjudication" governs the determination of a "final action" under section 332(c)(7)(B). Id. at 1000, 1004. Under Williamson County, "zoning authorities must be given an opportunity to arrive at a final, definitive position regarding how [they] will apply the regulations at issue" before there is a "ripe challenge." Id. at 1002 (quoting Williamson County, 473 U.S. at 191). Applying Williamson County, the Seventh Circuit concluded that "Sprint's complaint [was] not yet ripe for judicial review" since the BZA's decision was not a "final action" under section 332(c)(7)(B)(v). Id. at 1004. The Court reasoned that "[t]he BZA's decisions do not completely foreclose Sprint from establishing wireless telecommunications facilities . . . . In fact, those decisions merely map a procedural route that Sprint must take in order to proceed with its project . . . . Indeed, until Sprint is told definitely whether or not it is permitted to install an antenna and equipment shelter, it is mere speculation whether it even has an injury to complain of." Id. Further, the Court rejected Sprint's argument that "it would be futile to go back to the zoning board because it is not eligible for a special use permit" because

"[t]hese are precisely the types of issues that should be presented first to the local land use authority." Id.

Under Omnipoint Holdings, Williamson County, and Sprint Spectrum, the City Council's decision upholding the revocation of NewPath's encroachment permits is not a "final action" within the meaning of section 332(c)(7)(B)(v). Contrary to NewPath's assertion that the City made a final decision that NewPath is not exempt from the WTF Ordinance, the City Council only addressed and decided whether the City Manager had properly revoked NewPath's thirty-six permits. While implicit in that decision is the conclusion that the WTF Ordinance applies to NewPath, whether NewPath is entitled to an exemption was not squarely before, nor decided by, the City Council. Therefore, the City Council's decision does not constitute the "consummation" of the City's "descisionmaking process" on NewPath's ability to construct its DAS. Rather, it "merely maps[s] a procedural route that [NewPath] must take in order to proceed with its project." Sprint Spectrum, 361 F.3d at 1004. NewPath also argues, as did Sprint, "it would be futile" to seek an exemption because it is "not eligible"; however, "[t]hese are precisely the types of issues that should be presented first to the local land use authority, which has a better understanding of the local ordinances." Id. Further, the "impracticalities, time delays, expense and other inefficiencies" of "returning to the zoning board prior to seeking litigation" do not sufficiently outweigh concerns of ripeness. Id. at 1004-05. "Although [NewPath] at some point might have a mature claim, for now it must allow the local authorities to act with finality before pursuing a claim in federal court." Id. at 1004.

Since the City Council's decision is not a "final action" within the meaning of the TCA, NewPath's two claims under section 332(c)(7)(B) are not yet ripe for judicial review. A "lack of a final action is not simply a failure of an element of the claim but divests the court of jurisdiction over the matter." Sprint Spectrum, L.P. v. City of Carmel, 2003 WL 21254443, at *5 (S.D. Ind. Mar. 28, 2003), aff'd by, 361 F.3d 998 (7th Cir. 2004); see also S. Pacific Transp. Co. v. City of Los Angeles, 922 F.2d 498, 502 (9th Cir. 1990) (stating that ripeness "is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction"); Cox Commc'ns PCS, L.P. v. City of San Marcos, 204 F. Supp. 2d 1272, 1277 (S.D. Cal. 2002) (dismissing plaintiffs claims under section 332(c)(7)(B) because there was no final action). Therefore, NewPath has not demonstrated that it is likely to succeed on the merits of its claims under section 332(c)(7)(B) of the TCA.

**b. Section 253(a)**

NewPath also argues the City's actions effectively prohibit the provision of telecommunications services in violation of 47 U.S.C. § 253(a) of the TCA ("section 253(a)"). Specifically, NewPath argues "the City['s] requirement that NewPath prove it is exempt from an ordinance that otherwise prohibits NewPath's services" violates section 253(a). (Mot. for Prelim. Inj. 33:10-13.) The City rejoins that NewPath has not, and cannot, demonstrate "effective prohibition" under section 253(a).

Congress enacted section 253 of the TCA to "preempt[] state and local regulations that maintain the monopoly status of a telecommunications service provider." Sprint Telephony PCS, L.P. v. County of San Diego ("Sprint II"), 543 F.3d 571, 576 (9th Cir. 2008)

(en banc), cert. denied, 129 S. Ct. 2860 (2009).  Section 253(a)
provides that "[n]o State or local statute or regulation . . . may
prohibit or have the effect of prohibiting the ability of any entity
to provide any interstate or intrastate telecommunications service."
47 U.S.C § 253(a).  "Although a final action or decision is necessary
to file a claim under sections 332(c)(7)(B)(i)(I) and
332(c)(7)(B)(i)(II), neither is required under section 253."  Cox
Commc'ns, 204 F. Supp. 2d at 1278.

        At oral argument, NewPath clarified that it is raising only
an as-applied challenge to the City's WTF Ordinance under section
253(a).  However, section 253(a) is generally interpreted as providing
a vehicle for a facial challenge to a local ordinance.  See Sprint
Telephony PCS, L.P. v. County of San Diego, 490 F.3d 700, 709-715 (9th
Cir. 2007)("Sprint I") (discussing the differences between sections
332(c)(7) and 253(a) of the TCA and finding that section 253(a) allows
for facial challenges), reversed on other grounds by, Sprint II, 543
F.3d at 571; see also USCOC of Greater Mo., L.L.C. v. Village of
Marlborough, 618 F. Supp. 2d 1055, 1065 (E.D. Mo. 2009) (stating that
"Section 253 may be used to challenge zoning regulations on their
face, but is not the proper section to challenge application of a
zoning regulation"); GTE Mobilnet of Cal. Ltd. P'ship v. City and
County of San Francisco, No. C 05-04056 SI, 2007 WL 420089, at *3-7
(N.D. Cal. Feb. 6, 2007) (granting plaintiff's motion for summary
judgment on facial challenge to city's wireless ordinance under
section 253); Cox Commc'ns, 204 F. Supp. 2d at 1277 (stating that
"[w]here 47 U.S.C. § 253 provides a cause of action against *local
regulations*, section 332 gives a cause of action against *local
decisions*" (emphasis in original)).  Further, even if NewPath may

28

maintain an as-applied challenge to the City's WTF Ordinance under section 253(a), NewPath has not shown that this challenge is ripe for judicial review since NewPath has not yet sought permits under the WTF Ordinance. Therefore, NewPath has not shown it is likely to succeed on the merits of its section 253(a) claim.

### 3. "Vested Property Rights" Doctrine

NewPath also argues it is likely to succeed on the merits since the City's actions violate NewPath's "vested property rights" in the thirty-six encroachment and building permits. (Motion for Prelim. Inj. 33:26-27.) Specifically, NewPath argues it obtained a "vested property right to proceed with its DAS project in Davis . . . when the City issued valid construction permits and NewPath performed substantial work and incurred substantial liabilities - roughly $1.5 million - in good faith reliance on the [p]ermits." (Id. 34:20-23.) The City counters that "[t]here is no vested right to [an] invalidly issued permit[]." (Opp'n. 24:3.) At oral argument, NewPath conceded that if the thirty-six permits were impermissibly issued, their rescission was proper.

"[I]t has long been the rule in [California] . . . that if a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit. Once a landowner has secured a vested right the government may not, but virtue of a change in the zoning laws, prohibit construction authorized by the permit upon which he relied." Avco Cmty. Developers, Inc. v. S. Coast Reg'l Comm'n, 17 Cal. 3d 785, 791 (1976). However, under California law, "permits must be revoked" when an applicant has not complied with all applicable

ordinances.  <u>Horwitz v. City of Los Angeles</u>, 124 Cal. App. 4th 1344, 1356 (2004) (stating that "the City has no discretion to issue a permit in the absence of compliance [with all applicable ordinances]").

NewPath contends that the thirty-six encroachment and building permits were properly issued to it because it is exempt from the City's WTF Ordinance, or alternatively, application of the City's WTF Ordinance is invalid under state and federal law.  (Mot. for Prelim. Inj. 13-20.)  However, NewPath has not demonstrated that the permits were properly issued or that their revocation was erroneous. Therefore, NewPath has not demonstrated it is likely to succeed on the merits of this claim.

**4.  Estoppel**

Lastly, NewPath argues that the City is estopped from revoking the thirty-six permits.  The City responds that equitable estoppel is inapplicable where a permit violates a city ordinance.

In general, "four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury."  <u>Golden Gate Water Ski Club v. County of Contra Costa</u>, 165 Cal. App. 4th 249, 257 (2008) (quotation and citation omitted).  Further, "a party faces daunting odds in establishing estoppel against a government entity in a land use case. Courts have severely limited the application of estoppel in this context by expressly balancing the injustice done to the private

30

person with the public policy that would be supervened by invoking estoppel to grant development rights outside of the normal planning and review process . . . . Accordingly, estoppel can be invoked in the land use context in only the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow." Id. at 259.

NewPath has not satisfied the elements of an estoppel claim. Further, NewPath has not shown that this is an "extraordinary case where the injustice is great and the precedent set by the estoppel is narrow." NewPath, therefore, has not shown it is likely to succeed on the merits of this claim.

## B. Irreparable Harm

NewPath argues the City's revocation of its thirty-six building and encroachment permits and its inability to immediately construct the Davis DAS has caused it to lose revenue, damaged its reputation and goodwill, and impaired its ability to compete in its industry. NewPath specifically contends that it "is a new entrant to the telecommunications industry and, as such, must constantly work to establish and maintain its reputation and goodwill" with its customers. (Mot. for Prelim. Inj. 9:13-15.) Further, NewPath argues that "[a]s a result of the City's actions, and the consequent work stoppage on construction of NewPath's DAS in Davis, NewPath's ability to negotiate and enter into contracts to provide DAS services to potential [customers] . . . has been severely curtailed." (Id. 9:19-24.) The City rejoins that "NewPath's only asserted injury is lost business revenues and goodwill" which are injuries that do "not rise to the level of irreparable injury." (Opp'n 12-13.) NewPath counters "[d]amages will not adequately compensate [it] for the lost business

and impact to its reputation caused by the City's action and the delay associated with this litigation."  (Reply 1:26-27.)

A plaintiff "seeking preliminary relief . . . [must] demonstrate that irreparable injury is <u>likely</u> in the absence of an injunction"; the mere "possibility" of irreparable harm is insufficient.  <u>Winter</u>, 129 S. Ct. at 375 (emphasis in original). "Mere financial injury will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation."  <u>California v. Tahoe Reg'l Planning Agency</u>, 766 F.2d 1316, 1319 (9th Cir. 1985) (citation omitted).  However, "[i]njury to a business's goodwill and reputation is not easily measurable, and thus supports a finding of irreparable harm."  <u>Qwest Commc'ns Corp. v. City of Berkeley</u>, 146 F. Supp. 2d. 1081, 1103 (N.D. Cal. 2001) (finding irreparable harm based upon injury to goodwill and reputation where application of wireless ordinance and inability to build "conduit link" would have caused plaintiff to lose a contract, the procurement of which had enhanced plaintiff's reputation) (citing <u>Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.</u>, 944 F.2d 597, 603 (9th Cir. 1991)) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."));  <u>see also</u> <u>NextG Networks of Cal., Inc. v. County of Los Angeles</u>, 522 F. Supp. 2d 1240, 1256 (C.D. Cal. 2007) (finding irreparable harm where application of wireless ordinance to plaintiff would cause plaintiff to breach contracts with customers), <u>overruled on other grounds by</u>, <u>Sprint II</u>, 543. F.3d at 571; <u>Cox Commc'ns</u>, 204 F. Supp. 2d at 1263-64 (finding irreparable harm where plaintiff's inability to install wireless facilities would impair its ability to provide adequate coverage to its customers).  Further, "[a] sufficient

showing of injury to competition could support a finding of irreparable harm." <u>Am. Passage Media Corp. v. Cass Commc'ns., Inc.,</u> 750 F.2d 1470, 1473 (9th Cir. 1985). Nonetheless, a federal court should refrain "from interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury." <u>Midgett v. Tri-County Metro. Transp. Dist. of Or.,</u> 254 F.3d 846, 850 (9th Cir. 2001).

NewPath's Chief Executive Officer declares as follows in support of NewPath's argument that it will suffer irreparable harm:

> 18. If the City is allowed to continue to unlawfully delay the construction of NewPath's DAS Facilities, NewPath's customers will pursue other alternative means of providing telecommunications service in the City resulting in a direct loss of revenue to NewPath in the hundreds of thousands of dollars. In addition, NewPath and its Customer Carriers will be prevented from providing adequate wireless services in the City. Finally, NewPath and its Customer Carriers are being deprived of the full utilization of their existing licenses and business investments.

> 19. Because the wireless telecommunications provider market is limited to a few dominant companies, any such lost customers will be irreplaceable, which will jeopardize the foundation for NewPath's growing but still nascent business.

> 20. In addition, NewPath to date has expended approximately $1.5 million to secure the necessary equipment, personnel, and contractors in an effort to construct its DAS in the City.

> 21. The actions of the city have also caused NewPath irreparable harm to its goodwill and reputation especially in California. New projects have been and will be awarded to NewPath's competition. Thus, in addition to the irreparable harm done to NewPath's reputation, NewPath has irretrievably lost and will continue to lose revenue that would have been generated by other projects.

(Kavanagh Decl. ¶¶ 18-22.) This is the only evidence NewPath provides in support of its assertion of irreparable harm.

"In order to support a preliminary injunction, . . . irreparable harm to goodwill and reputation must be *demonstrated*, not merely alleged." Bell Atlantic Business Systems, Inc. v. Storage Technology Corp., No. C-94-0235 MHP, 1994 WL 125173, at *2 (N.D. Cal. Mar. 31, 1994)(concluding that "evidence demonstrating that [plaintiff] *might* lose customers as a result of [defendants' conduct]" was insufficient to support a finding of irreparable harm) (emphasis in original). The moving party's allegations of irreparable harm "must be shown by probative evidence, and conclusory affidavits are insufficient." Mesde v. Am. Brokers Conduit, No. C-09-02418 JF, 2009 WL 1883706, at *2 (N.D. Cal. June 30, 2009) (citations omitted). Here, NewPath's evidence of injury to its goodwill and reputation consists of the averment of its Chief Executive Officer that "[t]he actions of the city have . . . caused NewPath irreparable harm to its goodwill and reputation especially in California. New projects have been and will be awarded to NewPath's competition." (Kavanagh Decl. ¶ 21.) These averments, however, are "conclusory and without sufficient support." Am. Passage Media Corp., 750 F.2d at 1473 (finding affidavits from plaintiff's executives too conclusory and unsupported to establish irreparable harm); see also Dotster, Inc. v. Internet Corp. for Assigned Names and Numbers, 296 F. Supp. 2d 1159, 1163 n.2 (C.D. Cal. 2003) (finding moving party's support for injury to goodwill and reputation conclusory and insufficient to demonstrate irreparable harm). "Further, a finding of irreparable harm must be based on more than speculative assertions that the moving party will have greater difficulty obtaining contracts in the future." Bell Atlantic, 1994 WL 125173, at *3.

"As with harm to reputation or goodwill, a showing of irreparable harm to competition requires the production of probative evidence. Although a loss of customers and a resulting loss of revenue surely make it more difficult to compete, they do not amount to irreparable harm because such injuries are measurable and thus have an adequate remedy at law. Bell Atlantic, 1994 WL 125173, at *3 (citations omitted). Injury to a party's ability to compete is sufficient to support a preliminary injunction only if the moving party demonstrates that there is a "threat of being driven out of business." Am. Passage Media Corp., 750 F.3d at 1474. NewPath, however, only avers that any loss of customers will "jeopardize the foundation for NewPath's growing but still nascent business" since the "wireless telecommunications provider market is limited to a few dominant companies." (Kavanagh Decl. ¶ 19.) NewPath, therefore, has not shown that any injury to its ability to compete rises to the level of irreparable harm.

NewPath has not provided sufficient evidence to conclude that its alleged injuries to its reputation, goodwill, and ability to compete, constitute irreparable harm. See Bell Atlantic, 1994 WL 125173, at *3 (stating "[w]ithout a stronger showing of nonpecuniary damage, there can be no finding of irreparable harm"). Further, NewPath has not shown that any loss of revenue could not be compensated through an award of damages, should it prevail at trial. NewPath, therefore, has not clearly shown that it will suffer irreparable harm absent an award of injunctive relief.

## C. The Balance of Equities

NewPath argues it "has been and continues to be irreparably harmed in a manner that far exceeds any harm suffered by the City."

(Reply 6:26-7:2.)  The City rejoins, the balance of equities tips in its favor since the "damage to the physical environment and restoration of landscaping could not be easily, inexpensively or quickly undone."

"To qualify for injunctive relief, the plaintiff[] must establish that the balance of equities tips in [its] favor.  In assessing whether the plaintiff[] ha[s] met [its] burden, the district court has a duty to balance the interests of all parties and weigh the damage to each." Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138 (9th Cir. 2009) (quotations and citations omitted).

NewPath argues denial of the injunction will cause it financial injury and irreparable harm to its reputation and goodwill. However, compelling the City to reinstate the thirty-six encroachment and building permits would allow for the construction of seventeen new, wooden or metal poles within the City.  Both parties argue the equities tip in their favor.  However, since NewPath has not shown that it will suffer irreparable harm, it has not made a "clear showing" that the equities tip in its favor as is required to obtain mandatory preliminary injunctive relief.

### D. The Public Interest

NewPath argues "granting . . . the preliminary injunction promotes the public interest, as determined by Congress, the people of the State of California in its constitution, the state legislature and the CPUC, in [the] rapid deployment of facilities for ubiquitous and affordable telephone service."  (Reply 6:26-7:2.)  The City counters, arguing in conclusory fashion that the "public interest clearly weigh[s] heavily against the grant of a mandatory preliminary injunction."  (Opp'n 29:3-4.)

"The public interest inquiry primarily addresses the impact [of the preliminary injunction] on non-parties rather than parties." Sammartano v. First Judicial District Court, 303 F.3d 959, 974 (9th Cir. 2002). The City advances the local public interest of "address[ing] adverse visual impacts and operational effects of [telecommunications] facilities through appropriate design, siting, screening techniques and locational standards . . . ." DMC § 40.29.010(a). In contrast, NewPath advances the state and federal public interests of facilitating the provision of wireless telecommunication services. However, NewPath has not shown that the state and federal interests applicable to its proposed DAS override the City's local regulation over the siting of the telecommunication facilities NewPath seeks to construct. Nor has NewPath shown that federal and state interests are incompatible with the local interests sought to be fostered by the City's WTF Ordinance. Therefore, NewPath has not shown that the public interest favors a preliminary injunction.

### IV. CONCLUSION

Since NewPath has not made a "clear showing" that it is entitled to the preliminary injunctive relief it seeks, NewPath's motion for a preliminary injunction is DENIED.

**Dated:  March 18, 2010**


_____
GARLAND E. BURRELL, JR.
United States District Judge